The City of Chicago

*v.*

The Town of Cicero.

*Opinion filed June 23, 1904.*

1. Sanitary districts—*legislature may change boundaries of sanitary district.* The legislature has power to change boundaries of a municipal corporation organized for sanitary purposes, and section 1 of the act of 1903, (Laws of 1903, p. 113,) changing the boundaries of the Sanitary District of Chicago, is a valid exercise of such power.

2. Same—*section 26 of Sanitary District act is within the title of the act.* The title of the Sanitary District act of 1889, (Laws of 1889, p. 136,) in the words "An act to create sanitary districts and to remove obstructions" in certain rivers, is broad enough to authorize section 26 of the act, directing the method by which water shall be distributed from a city owning water-works in such district to a bordering municipality having no water-works.

3. Municipal corporations—*legislature may regulate city in operation of water-works.* The power of a city to maintain and operate a system of water-works is derived wholly from the statute, and the legislature may place such reasonable conditions upon the exercise of such power as it deems just, although it cannot deprive the city of its property without due process of law nor impair the obligations of the city's contracts.

4. Constitutional law—*section 26 of Sanitary District act is valid.* Section 26 of the Sanitary District act of 1889, requiring cities within such district having a system of water-works to furnish water to other municipal corporations in the district bordering upon such cities, which have no water-works system, at the boundary line at the same price charged to consumers of like quantities of water within the limits of the city, is valid, and does not take the property of the city without due process of law.

Cartwright and Hand, JJ., dissenting.

Appeal from the Circuit Court of Cook county; the Hon. Frank Baker, Judge, presiding.

Appellee, the town of Cicero, filed a petition in the circuit court of Cook county praying for a writ of *mandamus,* directed to the city of Chicago and to the authorities of that city, to compel them to furnish water at the boundary line between the said town and city from the water-works of Chicago, in sufficient quantities to sup-

ply consumers within said town, at no greater price than is charged for like large quantities, through meters, to consumers in Chicago.

The petition sets out section 26 of the act entitled "An act to create sanitary districts, and to remove obstructions in the DesPlaines and Illinois rivers," which was approved May 29, 1889, and in force July 1, 1889, and then alleges that the city of Chicago is in a sanitary district formed under the provisions of said act, owns a system of water-works and supplies water from a lake, which is saved from sewage pollution by the ditch which has been constructed in said district; that petitioner is an incorporated town within said district and borders on the city of Chicago; that it has not now, nor did it have at the time said district was created, any system of water-works; that petitioner has applied to the corporate authorities of said city to furnish water at the boundary line between said town and city, as provided by said section 26, but that the city refused to comply with such request. The petition further alleges that since the formation of such district the town of Cicero has paid into the treasury of the district, in the form of taxes collected from citizens of the town, more than a million dollars.

The answer of respondent admits all the allegations of the petition, except it denies that petitioner has paid into the treasury of said district any money in the form of taxes, and denies that the city of Chicago is within the sanitary district, and alleges that a very large portion of the city lies outside the boundary of the district. It avers that its water-works is owned by it in its private capacity; that its water-works system was built many years ago and paid for by taxes levied on property situated within its limits, and is operated with money received from citizens of Chicago who are supplied with water, and avers that the refusal of the city to comply with the request of said town has not deprived the latter of any of its rights.

To this answer petitioner replied that the object in creating said district was to turn the sewage from the district away from Lake Michigan, so that the entire district could have pure water from the lake; that prior to building the canal it was impossible for the city of Chicago to obtain pure water; that the legislature has recently passed an act for the annexation of further territory to said Sanitary District of Chicago, and that the town of Cicero will be further taxed for drainage purposes in said district.

A jury was waived by the parties and the cause was heard before the court upon a stipulation of facts, which in substance is as follows: It is agreed that at the time said sanitary district was created a large portion of the city of Chicago lay outside of that district, but if the act of 1903, in reference to this district, is valid, then the whole of the city is within the limits of the district; that the city is not yet able to furnish water to all of its inhabitants south of Eighty-seventh street, the original south line of the sanitary district; that the town of Cicero adjoins the city on the west; that prior to the formation of said sanitary district the city limits were extended further south than the south line of the sanitary district when it was organized; that the quality of water supplied by the water-works of the city has been improved about fifteen per cent by turning the sewage from the lake into the drainage canal; that there is a water main from said water-works running to the northeast corner of the town of Cicero, and that the pressure in such main ranges from eighteen to twenty-five pounds to the square inch; that the town of Cicero has paid its proportion of taxes into said district, and that the ordinance of the city of Chicago fixing water rates, provides that the charges for water per month shall be ten cents per thousand gallons for the first 165,000 gallons; above 165,000 and up to 5,000,000 gallons, eight cents per thousand; above 5,000,000 and up to 10,000,000 gallons, six

cents per thousand; and for all in excess of 10,000,000 gallons, four cents per thousand.

Defendant offered four propositions of law to be held, all of which the court refused, and rendered judgment awarding the writ of *mandamus* in conformity with the prayer of the petition.   From that judgment the city of Chicago appeals to this court.

WILLIAM D. BARGE, (EDGAR B. TOLMAN, Corporation Counsel, of counsel,) for appellant.

ROSS C. HALL, and WILLIAM H. HOLLY, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Appellant questions the constitutionality of section 26 of the act to create sanitary districts, which is found at page 347 of Hurd's Revised Statutes of 1901, and section 1 of an act approved May 14, 1903, found at page 113 of the session laws of 1903.   The sanitary district organized under the first mentioned act included within its limits the more populous and the greater part of the city of Chicago, but did not include the whole thereof.   Section 1, *supra*, enlarges the corporate limits of the sanitary district, and adds thereto those portions of the city of Chicago which were not included in the district as originally organized.   This is said to be a violation of section 31 of article 4 of the constitution of 1870, which reads as follows:

"The General Assembly may pass laws permitting the owners of lands to construct drains, ditches and levees for agricultural, sanitary or mining purposes, across the lands of others, and provide for the organization of drainage districts and vest the corporate authorities thereof, with power to construct and maintain levees, drains and ditches, and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this State, by special assessments upon the property benefited thereby."

We are unable to give our assent to this proposition. The question is, had the legislature the power to change the boundaries of this sanitary district? In our judgment, the section of the constitution above set out has no bearing on the question.

Prior to the adoption of the present constitution the legislature had the power to alter the boundaries of municipal corporations at will. The change of county boundaries in the earlier history of the State furnished an example of the frequent exercise of this power. *People* v. *Wren*, 4 Scam. 269; *Bush* v. *Shipman*, 4 id. 186; *People* v. *Power*, 25 Ill. 187; *Coles* v. *Madison County*, Breese, 154.

This court has had occasion to consider the operation of the constitution of 1870 upon this power.

"A municipal corporation is purely of legislative creation, for local government, in places where it is presumed the public welfare will be subserved thereby. Our constitution contains no restriction as to the organization of cities, towns and villages, or the changing and amending or repeal of their charters, and, consequently, no restriction in respect to uniting or dividing cities, towns and villages, or annulling their charters, save only that it cannot be by local or special law, but must be by a general law; and it is familiar law that in the absence of constitutional restriction the legislature may provide for the organizing, uniting, dividing or annulling such corporations, in such manner as it shall deem best to promote the public welfare.—*Morgan* v. *Beloit*, 7 Wall. 613; *Thornton* v. *Abbott*, 61 Mo. 176; *Colchester* v. *Seaber*, 3 Burr. 1866; *Mount Pleasant* v. *Beckwith*, 100 U. S. 514." *True* v. *Davis*, 133 Ill. 522.

"The only prohibition against the formation of municipal corporations by local or special legislation is in section 22, article 4, of the constitution. 'Sanitary districts,' or 'drainage districts for sanitary purposes,' are not enumerated in that section. The municipal corporations expressly mentioned are only 'cities, towns and

villages,' and the rule hereinbefore alluded to, that the expression of one is the exclusion of another, is applicable. (Smith's Com. on Stat. and Const. Law, sec. 508; *Prettyman* v. *Supervisors of Tazewell County*, 19 Ill. 406.) We held in *Owners of Lands* v. *People*, 113 Ill. 296, that a drainage district was not within the prohibition of this section, and, on principle, that must be conclusive here." *Wilson* v. *Board of Trustees*, 133 Ill. 443.

"All municipal corporations are subject to legislative control, and may be changed, modified, enlarged, restrained or abolished to suit the exigencies of the case. (*Coles* v. *Madison County*, Breese, 154; *Bush* v. *Shipman*, 4 Scam. 186; *People ex rel.* v. *Wren*, 4 id. 269; *Holliday* v. *People*, 5 Gilm. 214; *People* v. *Brown*, 83 Ill. 95.) The only restriction on the power of the legislature is, that under the present constitution no local or special law shall be passed incorporating cities, towns or villages or changing or amending their charters." *People* v. *Binns*, 192 Ill. 68.

"Such corporations are subject to the legislative control, and may be changed, modified, enlarged or destroyed by general law, to meet the legislative judgment of the public welfare. (*People* v. *Power*, 25 Ill. 187; *True* v. *Davis*, 133 id. 522; *Town of Somonauk* v. *People*, 178 id. 631.) It was within the legislative power and discretion, at the time, to enact such a charter as that incorporating the town of Cicero, (*Greeley* v. *People*, 60 Ill. 19,) and it was within its power to enact the law by which it has been divided and territory taken from it. The legislature may obtain the consent of the people in the locality to be affected, or not, as they may deem best, and the question whether the consent of a majority in the territory to be annexed or the consent of the whole town shall be required is one which addresses itself solely to the legislature." *Town of Cicero* v. *City of Chicago*, 182 id. 301.

In the light of these authorities and of the oft announced doctrine that the constitution of this State is to be deemed a restriction upon the legislative department

and not a grant of power to the law-makers, the conclusion is irresistible that the legislature has the power to change the boundaries of a municipal corporation organized for sanitary purposes. Section 1, *supra*, is therefore a valid exercise of the law-making power.

Section 26, *supra*, reads as follows: "Whenever in any such sanitary district there shall be a city, incorporated town or village, which owns a system of water-works and supplies water from a lake or other source which will be saved and preserved from sewage pollution, by the construction of the main channel, drain, ditch or outlet herein provided for, and the turning of the sewage of such city and district therein, and there shall be in such sanitary district any territory bordering on any such city, incorporated town or village within the limits of another city, incorporated town or village, which does not own any system of water-works, at the time of the creation of such sanitary district; then upon application by the corporate authorities of such latter named city, incorporated town or village, the corporate authorities of such city, incorporated town or village having such system of water-works shall furnish water at the boundary line between such municipalities by means of its water-works to the corporate authorities asking for the same in such quantities as may be required to supply consumers within said territory, at no greater price or charge than it charges and collects of consumers, within its limits for water furnished through meters in like large quantities."

It is urged that the subject of this section is not embraced in the title of the act, which is, "An act to create sanitary districts, and to remove obstructions in the Des-Plaines and Illinois rivers." The purpose of the act was to improve sanitary conditions and promote the public health throughout the district which should be organized under its provisions, by making speedy disposition of the sewage and drainage and by securing for the inhab-

itants of the district a supply of pure water. For many years Chicago had drawn her water supply from Lake Michigan on the east. The greater part of the sewage was drained into that lake. Pollution of the water necessarily resulted. The act contemplated the execution of a project by which the sewage should be carried west and south, eventually into the Illinois river, so that the waters of the lake, passing into the mains of the city, should no longer be contaminated. The term "sanitary," as used in the title of the act, is descriptive of these purposes. This section directs a method by which water of the desired character shall be provided for a part of the people of the district. We think its subject within the title.

It is then urged that the act amounts to taking from the city of Chicago its property, viz., water supplied through its system of water-works, without due process of law, and we are referred to the cases of *Wagner* v. *City of Rock Island*, 146 Ill. 139, and *City of Joliet* v. *Alexander*, 194 id. 457, as authorities for the proposition that a city owning and operating a system of water-works is engaged in a private enterprise, and while so doing is not exercising any governmental functions, and based on this conclusion we are cited to Dillon on Municipal Corporations, (4th ed.) 66, *Town of Milwaukee* v. *City of Milwaukee*, 12 Wis. 93, *Western Savings Fund Society* v. *City of Philadelphia*, 31 Pa. St. 175, *City of Montpelier* v. *City of East Montpelier*, 29 Vt. 12, and *New Orleans Railway Co.* v. *City of New Orleans*, 26 La. Ann. 478, as authorities for the further conclusion that the legislature has no more power over property so possessed by a city and used by a city in that capacity than it has over the property of private individuals. The adjudged cases to which we are referred are cases where the legislature had attempted to divest the title of a municipal corporation to its real estate. We think the case before us plainly distinguishable. While the statement of the law deduced by appel-

lant from the *Rock Island case* and the *Joliet case* is correct as far as it goes, those cases mean something more.

In *Wagner* v. *City of Rock Island, supra,* it is said (p. 153): "The business of furnishing the inhabitants of a city with water by means of water-works so constructed as to bring the water from some permanent source of supply, and distribute it, by means of pipes laid in the streets, to the residences and places of business of those desiring to obtain their water supply in that manner, though not an exercise of the powers of sovereignty, is undoubtedly a business which is public in its nature, and belongs to that class of occupations or enterprises upon which a public interest is impressed. The business carried on by common carriers, telegraph companies and gas companies are examples of the same class." And Dillon on Municipal Corporations is referred to as stating that in one sense such powers are public in their nature, because conferred for public advantage, while in another sense they may be considered private, because they are such as may be and often are conferred upon individuals and private corporations, and result in a special advantage or benefit to the municipality, as distinct from the public at large.

It is thus observed that the business is impressed with a public use similar to that of common carriers, telegraph companies, gas companies, water companies and other owners of public utilities, all of which are subject, in greater or lesser degree, to legislative control; and statutes affecting the owners of such utilities by lessening their privileges, regulating their charges and increasing their burdens, within reasonable bounds, are uniformly held valid. *Ruggles* v. *People,* 91 Ill. 256; *Ruggles* v. *Illinois,* 108 U. S. 536; *Munn* v. *People,* 69 Ill. 80; *Munn* v. *Illinois,* 4 Otto, 113; *Winona and St. Peter Railroad Co.* v. *Blake,* id. 180; *Chicago, Burlington and Quincy Railway Co.* v. *Iowa,* id. 155; *Shields* v. *Ohio,* 95 U. S. 319; *Franklin Life Ins. Co.* v. *People,* 200 Ill. 619; *Chicago Union Traction Co.* v. *City of*

*Chicago,* 199 id. 484; *Rogers Park Water Co.* v. *Fergus,* 178 id. 571; *City of Danville* v. *Danville Water Co.* 180 id. 235; *Ford* v. *Chicago Milk Shippers' Ass.* 155 id. 166; *Spring Valley Water-Works* v. *Schottler,* 110 U. S. 347.

The power of the city to maintain and operate a system of water-works is derived wholly from the statute. It must be conducted in the manner provided by the statute. The legislature has the power to place such reasonable conditions upon the exercise of this power as it deems just, but it is without the right to divest the title of the city to property held by it in its private or business capacity without due process of law, and is without power to impair the obligations of a contract made ·by the city in reference to such property. The statute here assailed does not offend in these particulars, as it is merely a regulation which enlarges the class entitled to purchase water from the city by extending that privilege to persons taxed to purify the water which fills the mains.

In the case of *People* v. *Nelson,* 133 Ill. 565, in passing upon the constitutionality of the act of 1889, under which the Chicago Sanitary District is organized, it is said (p. 580): "Of course, it must be conceded, both as a historical fact and as a fact abundantly shown by the terms of the act itself, that this scheme was formulated mainly, if not exclusively, with reference to the sanitary condition and needs of the city of Chicago and its environs, and we cannot give proper construction to the act without taking into account the peculiar situation of the territory which the proposed Sanitary District of Chicago was intended to embrace. Chicago is a city of probably one million inhabitants or more, and is bordered on the east by Lake Michigan, that lake being the source of its water supply. A few miles west of Chicago, and running in a north and south direction, is the DesPlaines river, and at a point opposite the southerly part of the city said river turns toward the south-west and runs in that

direction to the city of Joliet, below which it is known as the Illinois river. The territory between Lake Michigan and the DesPlaines river, and along the course of that river to Joliet, is nearly level, none of it being more than a few feet above the level of the lake, while at Joliet the general surface is quite a number of feet below the level of the lake. The object of the system of drainage proposed by said act is, to prevent the drainage and sewage of the city and its environs being carried into Lake Michigan, thereby contaminating the waters of the lake."

Cicero lies on the west of the city of Chicago, several miles from Lake Michigan but between Lake Michigan and the DesPlaines river. It is practically impossible for the inhabitants of the town to secure a supply of water from the lake except through the system of the city of Chicago. The town of Cicero has been included within the sanitary district since its organization,—a period of fourteen years. During that time its inhabitants have been paying taxes levied by the sanitary district, the object of which has been to turn the sewage of Chicago and its suburbs away from Lake Michigan, so that the water of that lake, which supplies the city, may not be polluted. Throughout that period the inhabitants of Cicero have borne taxation for the purpose of supplying the water-works system of the city of Chicago with pure water. Does the constitution prohibit the enactment of a statute that will require the city of Chicago to furnish the water which the town of Cicero has paid to supply to the water-works system of that city, to the inhabitants of Cicero at a rate fixed by the city? The position of the city of Chicago is, that although the property owners of Cicero pay to secure pure water for the Chicago water-works system, they shall not have the privilege of obtaining that water from the city of Chicago at the usual rates, for the reason, among others, that Chicago desires to furnish this water to persons residing south of Eighty-seventh street, in the city of Chicago,

who have paid nothing towards purifying the water supply, as they have been heretofore, and appellant claims they still are, outside the sanitary district. This is repugnant to natural justice.

Aside from the water rates which the city will be entitled to fix and collect, this section was drawn on the theory that the right to use the taxes collected in the town of Cicero, and other territory outside of Chicago, in assisting to secure a pure water supply almost wholly for the benefit of the city of Chicago, would compensate that city for the burden of being obliged to furnish water, at rates fixed by the city of Chicago, for the people of the smaller municipalities.

Section 26, *supra*, is a part of the original Sanitary act. It existed when this district was organized. By far the greater proportion of the voters within the district as it was originally organized resided in the city of Chicago. The law presumes that when they voted to adopt this act they knew that this section existed and that circumstances might arise under which it could be enforced. The citizens of Chicago have had the benefit of this act in taxing residents of outlying territory for a purpose almost wholly that of the greater municipality. They should not be permitted to escape the burden imposed by the act whose benefit they have enjoyed.

But it is said that it is not the city of Chicago that has enforced the Sanitary act and received its benefits, and that the city should not, therefore, be made to feel its burdens. This is based on the fact that the entire city was not in the district as originally organized. The great majority of her people were within its boundaries, and, as just stated, they constituted the great majority of the people of the district, and the water which they, with the other residents of the district, have paid to purify, the city of Chicago proceeds forthwith to supply to all the people of Chicago, whether they reside within the district or not. All the people of the city have had

the benefit of the act. The taxes collected in Cicero have been used for the benefit of the entire city of Chicago. The effect of this section is merely that of an amendment to the organic laws of the city in reference to the manner in which the system of water-works shall be operated. By this act the legislature, in effect, says to the people of that city: We will give you power to tax the property of the people of Cicero to provide pure water for your people if you will supply that water to the town of Cicero, for the use of its inhabitants, at the same price you supply it to others. Chicago accepted the act by turning its sewage and drainage into the channels provided by the sanitary district and by supplying the purer water secured to all residents of the greater municipality. The city should not now be heard to urge the unconstitutionality of the section which requires it to furnish to the town of Cicero that which the people of the town have helped the city of Chicago to procure under the operation of the statute of which this section is a part. (*Ferguson* v. *Landram*, 5 Bush, 230; *VanHook* v. *Whitlock*, 26 Wend. 43; *People* v. *Murray*, 5 Hill, 468; *Daniels* v. *Tearney*, 12 Otto, 415.) Immense sums of money have been expended in the prosecution of the colossal undertaking set on foot by the sanitary district. The enterprise has reached a point where its practical effects are enjoyed in a purer water supply, and where it seems probable that eventually contamination from the sewage will be entirely avoided. The people of Cicero have contributed to the fund that has brought this about. Unless the boundaries of the district should be changed so that the town will be excluded, they must contribute for all time. They have received no benefit up to this time, and if the position of the city is correct, they can never, in all time, receive any benefit in the way of a better water supply, either from taxes heretofore paid or taxes which they may hereafter pay to meet the expenditures of the sanitary district.

It is argued with great vehemence that the effect is to take the property of the city of Chicago without the slightest pretense that any compensation therefor has been paid or even ascertained. The argument of the city's legal representatives, to quote their language, is as follows: "Such a procedure deprives us of all voice in the matter. It deprives us of our constitutional right to have this compensation determined by a jury. It deprives us of our right to participate in the selection of that jury. It makes the award without giving us any opportunity to introduce any testimony showing the real value of the service rendered and the property taken. It fixes the award without regard to value. It is nothing more nor less than a confiscation of our property and a delivery of it to another." This makes it necessary to inquire, who is to fix the rate that the town of Cicero is to pay? It is fixed by the ordinances of the city of Chicago, and the only limitation upon the right of the city in that respect is, that it shall be a reasonable rate and no greater than that charged to other consumers. If it could be fixed by a jury and was fixed by them at a higher rate than this, the verdict would be set aside. The position of the city is, that this statute cannot stand because it does not provide for a tribunal to fix the compensation which the city is to receive for the water furnished, when the right to fix the compensation is left with the city itself. It would seem that he who is permitted to fix his own price is not injured by the failure of a statute to provide that the price should be fixed by another.

The suggestion that the view which the court has adopted may lead to the bankruptcy of the city is without weight. The city is warranted in charging a reasonable rate for this water, which must be uniform among all large water takers. A reasonable rate, considering the city now in its business capacity aside from its governmental capacity, would at least be such a rate as would re-pay to the city all the expense of furnishing the

water. If the rate at which the water is now furnished is so low that the operation of the water system leads in the direction of insolvency, the difficulty is one which can be readily adjusted by appellant itself. Section 26, *supra*, is not within the constitutional inhibition.

The propositions of law submitted by the city were properly refused.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*

CARTWRIGHT and HAND, JJ., dissenting.

Subsequently, upon consideration of the case on rehearing, the following additional opinion was filed:

Per CURIAM: The petition for rehearing is but a reargument of the same points made on the submission of the case at the December term, 1903, and violates rule 30 of this court. We would have been fully justified in striking it from the files of our own motion under the announcement in *Chicago City Railway Co.* v. *O'Donnell,* 208 Ill. 267. The important public interests involved were, however, considered by a majority of the members of the court to call for a re-examination of the record, and therefore the petition for a rehearing was allowed.

Two grounds of reversal are urged in the petition, both of which were argued at length on the former submission: First, that the act of 1903 is invalid because the legislature had no power to arbitrarily create a sanitary district; and second, the act of 1889 is unconstitutional and void in so far as it attempts to interfere with the city of Chicago in the control of its private property. Both points are fully considered and decided in our former opinion. A reconsideration of them in the light of the re-argument in the petition by appellant, and appellee's reply thereto, has led to the conclusion that our former opinion is right, and it will be re-adopted.

*Judgment affirmed.*